Oman Construction Company, Inc. v. Commissioner.
Oman Constr. Co. v. Commissioner
Docket No. 4223-63.
United States Tax Court
T.C. Memo 1965-325; 1965 Tax Ct. Memo LEXIS 3; 24 T.C.M. (CCH) 1799; T.C.M. (RIA) 65325; December 29, 1965
*3 Held, the petitioner was not availed of during the taxable years for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. William Waller and Lawrence Dortch, American Trust Bldg., Nashville, Tenn., for the petitioner. J. D. Yarbrough, for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: The respondent determined deficiencies in income tax in the respective amounts of $857,007.83, $101,529.10, and $2,407,754.29 for fiscal years ending March 31 in 1958, 1959, and 1960, respectively. The sole issue remaining for decision is whether the petitioner is liable for the accumulated earnings tax for the years in issue imposed by sections 531 and 532 of the Internal Revenue Code of 1954. Concessions of both parties relating to other issues will be given effect under Rule 50. Some facts are stipulated. Findings of Fact The stipulation of facts and exhibits attached *5 thereto are incorporated herein by this reference. The petitioner is a corporation organized under the laws of Tennessee on April 26, 1950. It has kept its books and filed its Federal income tax returns on the completed contract method of accounting for fiscal years ended March 31. Its returns for the fiscal years ended in 1958, 1959, 1960, and 1961 were filed with the district director of internal revenue at Nashville, Tennessee. Petitioner's authorized capital stock is 50,000 shares of common stock of $10 par value. On organization, 25,000 shares were issued, of which John Oman, III, received 11,250 shares, Stirton Oman 11,250 shares, and R. H. Godwin 2,500 shares. The shares were issued in exchange for stock of Volunteer Clearing Company, Inc., machinery and equipment, and cash. During the fiscal years here involved John Oman, III, was president until March 20, 1960, when he was killed in an accident. Stirton Oman was chairman of the board and secretary until that date, and also president thereafter. Godwin was executive vice president. George A. Collin was treasurer. The original directors were John, Stirton, and Godwin. After the death of John, G. Frank Cole was elected a *6 director. Cole was an officer of the bank which was a co-executor under the will of John. Later, Collin was elected a director. In the fiscal years 1958, 1959, and 1960 the salaries of John and Stirton were respectively $45,000, $50,000, and $60,000 each, and the salary of Godwin was $35,000, $40,000, and $45,000, respectively. After the death of John the First American National Bank, Nashville, Tennessee, and the surviving spouse were appointed co-executors under the will. John was survived by a widow and four daughters, one of them a minor. It was the understanding of the Oman brothers that in the event of the death of John the corporation would redeem his stock so that his widow and daughters would not be dependent on the corporation's future earnings and so that the surviving stockholders could continue the business without having to practice a conservative policy to protect the estate of the deceased stockholder. The executors made a proposal to sell John's stock to the corporation for redemption and the directors accepted the proposal. On June 23, 1960, the petitioner redeemed the 11,250 shares of stock owned by the estate of John for the sum of $2,250,293.38. Of this amount *7 $1,527,767.28 was provided by life insurance carried by the petitioner, and the balance of $722,526.10 was provided from other assets. Of the payment, $112,500 was charged to capital and the remainder to surplus. The stock redeemed was not reissued. After the petitioner redeemed the stock from the estate the total shares outstanding were 13,750, held 11,250 by Stirton and 2,500 by Godwin. The capital stock account was reduced to $137,500. Petitioner paid no dividends prior to December 1959. It paid dividends of $6,250 on December 15, 1959, and $6,250 on March 15, 1960, and other dividends thereafter. Petitioner was in the business of highway and heavy construction, including building highways, railroads, bridges, airports, pipelines, tunnels, dams, missile bases, and all kinds of excavation and earth moving. It has obtained contracts principally by competitive bidding on a lump sum or fixed unit price basis. It does practically no subcontracting of work to others. It undertakes the risks of its contracts, including adverse weather, storms, or floods, and errors in judging subsoil conditions, strikes, increases in costs of labor or materials, and other hazards. Petitioner has *8 also participated as a joint venturer in foreign contracts in Spain, the Azores, Iran, Pakistan, Saudi Arabia, and Panama. The plan of the stockholders was to build up the net worth of the petitioner so that it could obtain and perform an increasing volume of work. They hoped to secure contracts for the petitioner under the interstate highway program. Petitioner also contracted for railroad construction. A large part of the petitioner's work has been for Federal or state agencies or state highway departments. These often require contractors to provide performance bonds written by surety companies, and bid bonds to have the bids considered. The surety industry has requirements to be met by a contractor to qualify for such bonds. In general, it is required that the contractor's net liquid assets should be at least 10 percent of the work program to be undertaken, or its net worth should equal 20 percent of such program, including both unfinished work at hand and the bid for new work, provided the contractor's reputation, experience, and organization are adequate. In its fiscal year ended in 1954 petitioner had a subcontract to build part of a pipeline in Kentucky for Texas Eastern *9 Gas Company. The contract price was $710,000 and petitioner's costs aggregated $1,416,000 resulting in a loss of $706,000. At March 31, 1954, petitioner had a deficit in earned surplus of $327,136.81. On another contract in Mississippi, after petitioner completed building a highway and before it was accepted by the state, it was washed out by a hurricane. Petitioner was required to rebuild the highway without additional compensation. Petitioner experienced losses on some other contracts during the taxable years. Petitioner was a participant in joint ventures under the name of Codell and Oman engaged in railroad construction, having a 50 percent interest. The net income reported by these ventures amounted to $52,691.67 for the calendar year 1959 and $579,598.92 for 1960. Petitioner engaged in a foreign joint venture under the name Oman-Farnsworth-Wright, performing work in Panama and in the Azores, having a one-third interest. This venture reported income of $6,212,023.88 for the fiscal year ended July 31, 1960, and had a loss in the following fiscal year. Petitioner engaged in a joint venture in the United States with three other corporations under the name of Midland Constructors. *10 Petitioner invested $700,000 and had a 20 percent share. In the period January 2 to June 30, 1961, the venture was operated at a loss, of which petitioner's share was $264,571.51. Petitioner had a 50 percent interest in a joint venture known as Oman-Huffman-Wolfe, which reported income of $75,451.53 for the fiscal year ended March 31, 1958. Petitioner was a member of a joint venture known as Goysa-Oman-Farnsworth-Wright, performing work in Spain, which had ordinary income of $1,348,672.38 for the fiscal year ended August 31, 1959, and $82,107.30 for the following fiscal year. Petitioner's share of these profits was in the respective amounts of $298,325.02 and $17,789.92. Oman Construction Company (sometimes hereinafter called Oman partnership) was a partnership composed of Stirton and John, which engaged in the rental of equipment, the construction business, and farming. They shared the profits and losses equally. During the calendar years 1958 and 1959 the partnership had ordinary income in the respective amounts of $80,818.38 and $67,883.08. Oman Development Company is a corporation whose shares were owned by Stirton's wife and three daughters and by John, later by his estate. *11 Its income is from rents of a shopping center in Nashville. The petitioner constructed the buildings under a contract with Oman Development Company. Petitioner's assets included considerable amounts of cash during the years in issue. The foreign joint ventures collected money from billings in excess of related costs and distributed the cash to members. In 1960 petitioner also derived cash from such billings on domestic work. The cash balances at the end of the fiscal years were (in thousands) as follows: 3/31/57
$ 641
3/31/58
1,200
3/31/59
2,819
3/31/60
4,689
3/31/61
3,299
Petitioner frequently made cash deposits in lieu of bid bonds when bidding on contracts. In a number of instances the amount of cash so deposited was in excess of $100,000 and was on deposit for from five to twenty days. Petitioner bought $200,000 in face amount of Federal National Mortgage Association bonds in fiscal 1959 which it used as collateral in place of surety bonds in railroad construction contracts. In the fiscal years 1958, 1959, and 1960 the petitioner advanced funds to John and Stirton on open accounts with each of them and continued in fiscal 1961 to carry an account *12 with Stirton. The petitioner paid bills for personal expenses of the Omans and the latter repaid the advances by credit of salaries or by other payments from time to time. The advances were usually repaid in full at the end of each fiscal year. They were made for the convenience of the Omans who were frequently absent on business trips. The average balances due the petitioner in each fiscal year were: Year
Stirton
John
1958
$59,042.34
$61,610.37
1959
12,683.41
12,563.67
1960
33,142.62
41,602.88
1961
81,673.43 The Omans were in a position to repay the advances at any time if the funds were needed by the petitioner. In fiscal 1960 the Oman partnership borrowed $365,000 from petitioner for a few months for use by the Omans in paying Federal income tax deficiencies determined against them and filing refund claims and suits to recover. The brothers repaid this amount before the end of the fiscal year. In June 1959 the Omans also borrowed $300,000 from petitioner to purchase a parcel of land, which amount was also repaid to petitioner before the end of the fiscal year. The property was acquired by Oman Development Company. Petitioner made a profit on a *13 contract to build a shopping center on the land for Oman Development Company. At February 29, 1960, the Omans owed petitioner $72,000 each on open account and as partners owed $406,000 on a loan, and also owed $300,000 for the purchase price of land, or a total of $850,000. On May 28, 1959, petitioner loaned Thompson and Green Machinery Company, Inc., the sum of $1 million on notes at six percent interest. The borrower repaid $500,000 on April 27, 1960, and repaid the remaining $500,000 on January 9, 1961. Petitioner reported and paid tax on the interest earned on this loan. On May 9, 1960, petitioner loaned the sum of $500,000 to Associates Finance Company, which repaid this loan on February 6, 1961. Petitioner reported and paid tax on the interest earned on this loan. On June 4, 1959, Stirton Oman and his wife, Frances, purchased a tract of land located on Industrial School Road in Davidson County, Tennessee. Thereafter, in March 1960, Stirton and Frances deeded this tract of land to petitioner for the sum of $165,483.25. The petitioner assumed a mortgage of $80,000, with the balance of the purchase price, $85,483.25, being paid in cash. It planned to construct an industrial *14 building for a prospective buyer. It subsequently sold this tract of land at a profit when the owner of adjacent property offered to buy it. Vine Street Realty Company, Inc., hereinafter referred to as Vine Street, is a corporation organized in 1954 under the laws of Tennessee. Its stock consisted of 2,050 shares of common stock of the par value of $10 per share and was held 920 shares each by Stirton and John, and 210 shares by Godwin. The estate of John still holds the stock of the decedent, and no other shares have been transferred. Vine Street filed a corporation income tax return for the fiscal year ended May 31, 1961. The officers included Stirton and Godwin. In August 1959 petitioner purchased a tract of land, hereinafter referred to as the Lightman property, consisting of approximately 205 acres located in Nashville and on the Cumberland River, for the sum of $300,454.50. It was purchased for a cash outlay of $30,000 and the assumption of a mortgage in the amount of $270,000. The petitioner transferred this property to Vine Street for the sum of $300,454.50 on June 21, 1960. Included in this transfer was a tract of land owned by petitioner located on Murfreesboro Road which, *15 at the time of transfer, had a basis to petitioner of approximately $40. Petitioner used the Lightman property as a source of topsoil for its construction jobs in and near Nashville and as a place for dumping waste materials. When petitioner transferred this property to Vine Street it was agreed that petitioner might continue to use the topsoil and to dump waste material. The property was considered usable at some future time for an industrial subdivision after the level of the land was raised. In February 1960 petitioner's funds in the amount of $22,474.40 were used to purchase two lots at Boca Raton, Florida. Title to one lot was taken in the name of John Oman, III, and title to the other was taken in the name of Stirton Oman because the sellers would not transfer title to a corporation. The purpose of this purchase was to build houses for resale in a venture with another contractor. The Southeast Tractor and Equipment Company is a corporation which engaged in the business of selling construction machinery and farm implements. From October 18, 1957, to October 28, 1960, its stock was held as follows: Shares
Bessie B. Oman
100
J. J. Donovan
150
Stirton Oman
100
John Oman, III
100
*16 On the death of John his 100 shares passed to his estate. The corporation purchased the 150 shares owned by J. J. Donovan on October 28, 1960, for the sum of $250,000. At the time of this purchase the Southeast Tractor and Equipment Company had lost its distributor franchise and was inactive. In the calendar year 1960 petitioner bid on highway construction contracts in excess of $98 million, was awarded over $16 million, and was next to lowest bidder on $14 million. In the calendar year 1961 petitioner bid on highway construction contracts in excess of $49 million, was awarded over $11 million, and was next to lowest bidder on $3 million. Petitioner's joint ventures had certain contracts with the Defense Department which were subject to renegotiation. In two cases the Renegotiation Board determined that excessive profits resulted - of $1,500,000 in one case and $450,000 in another. Petitioners were filed in the Tax Court in such cases. The joint venture in Pakistan, under renegotiation, agreed to refund $4 million. The following schedule shows the volume of work undertaken and performed by petitioner in the years shown, including its share of joint ventures. The backlog represents *17 the uncompleted contracts less work performed to date. Work in place shows work performed during the fiscal year: Backlog at
F/Y Ended
Beginning of
Contracts
Volume of Work
March 31
Fiscal Year
Awarded
in Place
(Amounts in Thousands)
1957
$ 8,664
$20,816
$13,904
1958
15,576
21,737
18,451
1959
18,862
27,569
26,261
1960
20,170
30,733
27,256
1961
23,646
31,962
28,419
1962
27,189
28,345
32,870
Petitioner reported gross revenues on the completed contract basis for the fiscal years as follows: F/Y Ended
As Sole
From Joint
March 31
Contractor
Ventures
Total
1957
$ 4,342,916
$ 2,831,531
$ 7,174,447
1958
5,587,428
2,746,867
8,334,295
1959
7,733,860
320,665
8,054,525
1960
10,582,578
2,600,239
13,182,817
1961
8,427,753
15,169,609
23,597,362
The revenues from joint ventures reported in fiscal 1961 included $14,323,596 from a venture in the Azores. This venture was substantially completed in fiscal 1960. Transferring this amount to the earlier year, the revised totals are $27,506,413 for fiscal 1960 and $9,273,766 for fiscal 1961. Petitioner's returns reported the following: Fiscal Years Ended March 31
(Amounts in Thousands)
1958
1959
1960
1961
Gross receipts
$5,587
$7,734
$10,583
$8,428
Less cost of operations
4,602
6,257
8,247
6,636
Gross profit
$ 985
$1,477
$ 2,336
$1,792
Income from joint ventures
1,145
773
1,327
2,518
Other income
32
20
89
131
Total income
$2,162
$2,270
$ 3,752
$4,441
Deductions
1,783
2,045
2,914
2,946
Taxable income
379
225
838
1,494
Tax
191
112
430
768
*18 The balance sheets on petitioner's returns showed the following: Fiscal Years Ended March 31
(Amounts in Thousands)
1957
1958
1959
1960
1961
ASSETS: Cash
$ 641
$1,200
$2,819
$ 4,689
$3,299
Receivables
795
431
860
3,314
1,293
Investments
71
781
554
466
1,505
Fixed (net)
944
821
1,442
2,182
2,067
Land
494
196
Other
3
3
Total Assets
$2,454
$3,237
$5,675
$11,146
$8,360
LIABILITIES AND CAPITAL: Accounts payable
$ 191
$1,727
$4,212
$ 6,230
$4,958
Short-term
686
302
323
64
10
Long-term
292
63
54
340
60
Accrued expenses
322
226
33
75
107
Other liabilities
357
146
204
1,773
2,163
Stock
250
250
250
250
137
Surplus
356
522
599
2,414
925
Total
$2,454
$3,237
$5,675
$11,146
$8,360
Respondent recomputed petitioner's balance sheets as follows: Fiscal Years Ended March 31
(Amounts in Thousands)
1957
1958
1959
1960
1961
ASSETS: Current
$1,436
$1,580
$3,617
$ 7,977
$4,532
Investments
71
53
346
339
712
Land
494
196
Fixed (net)
1,110
824
1,442
2,182
2,067
Other
3
Total assets
$2,620
$2,456
$5,406
$10,992
$7,507
LIABILITIES: Current
$1,578
$ 387
$ 757
$ 1,938
$1,332
Long-term
302
54
340
60
Other
16
16
26
16
Investment in joint venture contracts
356
987
3,747
5,059
5,020
Capital stock
250
250
250
250
137
Retained earnings
436
514
582
3,379
3,080
Treasury stock
(2,138)
Liabilities and equity
$2,620
$2,456
$5,406
$10,992
$7,507
*19 Petitioner made the following net purchases of construction equipment during the indicated fiscal years: Net Pur-
End Year
F/Y Ended
chases
Balance
1957
$ 454,136
$2,048,188
1958
188,943
2,794,026
1959
584,554
3,378,580
1960
1,238,467
4,617,047
1961
770,411
5,387,458
1962
1,314,921
6,702,379
The petitioner deducted the following amounts of depreciation on depreciable assets for the indicated fiscal years: F/Y Ended
Amount
1958
$ 586,262.88
1959
708,703.11
1960
1,272,352.99
1961
1,181,804.17
1962
1,568,162.60
Petitioner had a net operating loss in the fiscal year ended in 1961 in the amount of $429,007.53 for the purpose of determining a net operating loss carryback to the fiscal years 1958 and 1959. Petitioner received income from a joint venture of Oman-Farnsworth-Wright in the amount of $1,926,921.57 which it reported in its return for fiscal 1961. This amount should have been reported in its return for fiscal 1960. An additional amount of $143,753.05 of income received from this joint venture was not reported in either fiscal 1960 or 1961. This amount should have been included in petitioner's return for *20 fiscal 1960. The Department of Water Resources of the State of California in 1962 announced its requirements for prequalification of contractors as follows: Legal provisions relative to the prequalification of contractors are contained in Section 14310 to Section 14313 inclusive of the Government Code. The purpose of establishing prequalification rating for contractors is to ensure that contractors who bid on work for the Department of Water Resources are financially able, reasonably well equipped, and have sufficient experience to satisfactorily complete any contract awarded them. While Section 14310 of the Government Code permits but does not require dispensing with the prequalification procedure in connection with contracts estimated to cost $50,000 or less, it is the policy of the department to require prequalification on all contracts, except test hole drilling, the estimated cost of which exceeds $15,000. The rating procedure of the Department of Water Resources is similar to the method used by the Division of Highways, Department of Public Works. However, the rating established may differ. The financial limitation as used by this department is ten times the working *21 capital (excess of current assets over current liabilities) or four times the net worth (capital plus surplus) whichever is the smaller. The amount of the working capital or net worth used for rating purposes is not necessarily the amount reflected on the balance sheet included in the statement, but is determined by the accounting section from the information included. After establishment of a financial limitation, the statement is reviewed for consideration of the factors of experience, amount and suitability of equipment, personnel, performance on past work, or other factors which may have a bearing on the ability of the contractor to satisfactorily carry out a contract with this department. Contractors will be advised by letter of the rating established. At the time of application for a proposal form for use in submitting a bid on a specific project, the rating will be subject to reduction by the value of any work under way whether or not it is with this department. In 1962 the petitioner, with seven other contractors, formed a joint venture, Oro Dam Constructors, which secured a contract with the State of California to build the Oroville Dam at a price of $121 million. The *22 state required as a prequalification of the contractors that they have financial resources of working capital of 10 percent or net worth of 25 percent of the contract price. The petitioner undertook a participation of 11 percent initially and later, in 1964, increased this to 20 percent when another member transferred its interest and petitioner qualified for a larger share. This contract was still under construction at the time of the hearing. Petitioner has borrowed money from time to time for operations, and the joint venture in Pakistan borrowed from American Express Company for operations there. At the time of the hearing petitioner was borrowing and also had $1,850,000 invested in the Oroville Dam joint venture without prospect of an early repayment. The notice of deficiency herein was mailed June 12, 1963. Before such mailing the respondent informed the petitioner that the proposed notice would include an amount with respect to the accumulated earnings tax imposed by section 531 of the Internal Revenue Code of 1954. The petitioner filed a timely statement pursuant to section 534(c), stating the grounds upon which it relies to establish that its earnings *23 and profits have not been permitted to accumulate beyond the reasonable needs of its business, together with facts sufficient to show the basis of such grounds. The statement represented as follows: That the accumulated earnings and profits were reasonable in the performance of construction contracts, and that on March 31, 1959, petitioner was performing construction contracts aggregating over $14 million; That the volume increased and at March 31, 1961, reached $36 million, and that the taxpayer's working capital did not exceed what was reasonably necessary for performing this volume of work; That the above figures did not include work in which taxpayer was a participant in joint ventures and that taxpayer was a one-third participant in joint ventures, doing work for the United States Corps of Engineers all over the world, including Pakistan, the Azores, Iran, Saudi Arabia, and Spain; That during fiscal 1960 the joint venture undertook additional work outside the United States aggregating over $29 million, which required cash resources in excess of what was available without borrowing, and that the joint ventures were indebted in the amount of $2,775,000 on March 31, 1959, and *24 over $1 million at March 31, 1960; That since taxpayer reported income on a completed contract basis, it received sums in payment of work on which taxes would not be payable until completion and it was necessary to accumulate cash to pay later income tax obligations; That the joint venture contracts were subject to renegotiation, and during these years it was uncertain how much would have to be refunded; That the Renegotiation Board made awards in the amount of $450,000 on certain contracts and $1,500,000 on other contracts which made it necessary to accumulate cash to meet such contingent obligations; That taxpayer has made use of cash to reduce costs by making purchases of equipment at discounts, purchases of structural steel, of land for borrow pit purposes, and purchases of other materials; That taxpayer's construction contracts were substantially all lump-sum contracts as distinguished from cost plus fixed fee contracts with the result that taxpayer incurred substantial risks and needed working capital to preserve its financial stability in the event of losses; and That new equipment purchases are constantly necessary in performing construction jobs of the character *25 undertaken, and that over $2 million in fiscal 1959 and $2,800,000 in fiscal 1960 was used for purchases of new equipment. The statement further represented that substantial working capital was needed in order to obtain new contracts; That taxpayer was obtaining new contracts in its own name and as a participant in joint ventures, and in order to bid on additional contracts it maintained the necessary organization of key personnel and the necessary working capital and net worth to enable it to do this; That maintenance of the organization required substantial reserves and in bidding on contracts the corporation in many states must post a certified check in order to bid and provide a performance bond if the bid is accepted; That the ability to make a sufficient bond depends upon net worth and working capital In the fiscal year 1959 the taxpayer issued an aggregate of $2,693,000 in certified checks and made over $5 million in performance bonds in the State of Kentucky alone; That in order to bid on large construction contracts it is necessary for taxpayer's balance sheet to demonstrate the financial ability to perform; That taxpayer could not bid on certain large jobs if *26 it had not accumulated earnings and profits for these purposes; That taxpayer is now performing as sponsor of a joint venture a contract in California for a price of approximately $121 million in which taxpayer has an interest of 11 percent, and that its interest is limited because California limits the participation of any one contractor to the lesser of 15 times net current assets or four times net worth. The statement further represented: That because of the death of John Oman, III, in 1960, taxpayer's assets as of March 31, 1960, included $1,500,000, the face value of life insurance policies on the life of this officer of the taxpayer; That it was understood between the stockholders that his stock would be purchased from his estate in the event of his death; and That this insurance had been procured for the purpose of providing funds for such purchase, and that the corporation purchased the stock for $2,250,293, using the proceeds of the insurance and other available cash. The earnings and profits of petitioner were not permitted to accumulate beyond the reasonable needs of its business during the taxable years involved. The petitioner was not availed of during the *27 taxable years for the purpose of avoiding the income tax in respect of its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. Opinion Respondent determined that petitioner is liable for the accumulated earnings tax imposed by sections 531 and 532 of the Internal Revenue Code of 1954 for each of the fiscal years ended in 1958, 1959, and 1960 because it was availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. Section 531 imposes a tax upon the accumulated taxable income of a corporation described in section 532 as being availed of for the purpose of avoiding the income tax with respect to shareholders by permitting its earnings and profits to accumulate instead of being divided or distributed. [1]
*28 Section 533[2] provides that the fact that earnings and profits are accumulated beyond the reasonable needs of the business establishes the prohibited purpose unless the corporation proves otherwise by the preponderance of the evidence. The reasonable needs of the business include reasonably anticipated needs. Section 537. Section 534[3] provides a method whereby the corporation may shift to respondent the burden of proof as to whether earnings were accumulated beyond the reasonable needs of the business. If after notification of respondent's intention to impose the accumulated earnings tax the corporation submits a statement *29 of the grounds it relies upon to establish that its earnings and profits were not accumulated beyond its reasonable needs, together with facts sufficient to show the basis thereof, the burden of proof as to these grounds shifts to respondent. *30 After notification of respondent's intention to impose the section 531 tax the petitioner submitted a statement pursuant to section 534 stating the grounds it relied upon to establish that its earnings and profits were not accumulated beyond its reasonable needs, together with facts intended to show the basis of the grounds alleged. The petitioner contends that its statement is sufficient to shift the burden of proof to respondent with respect to the grounds contained therein. Respondent maintains that the facts contained in the statement are not sufficient to show the basis of the grounds alleged and that the statement is too general and is not specific as to the amounts of earnings needed to be retained for particular purposes. We think the statement submitted by the corporation is sufficient to shift the burden of proof to respondent as to the fiscal years ended in 1959 and 1960. The statement made no reference to the fiscal year ended in 1958. The allegations state grounds which, if true, would support a finding that the accumulation of earnings was for the corporation's reasonable business needs. The facts presented to show the basis of these grounds are material and definite *31 and substantially support the grounds alleged. The corporation is required in the section 534 statement only to present facts sufficient "to show the basis" of the grounds it relies upon, not to establish its case. We need not, however, rely upon the conclusion that the respondent as to certain years has the burden of proof upon the question of reasonable needs since in our opinion the evidence presented establishes that retention of petitioner's earnings in each of the years in issue was reasonably necessary to provide the working capital required for its business. Respondent contends that petitioner accumulated earnings beyond the reasonable needs of its business, pointing out that it loaned large sums, at one time exceeding $850,000, to its stockholders, and says that such loans represented funds not needed in the business and were substitutes for dividends which petitioner did not pay. Respondent says further that petitioner made other large loans that had no reasonable relation to the conduct of its business; made investments in land, properties, and securities unrelated to its activities; and retained funds to provide against unrealistic hazards. Respondent says that petitioner's *32 retained earnings increased in the three years from March 31, 1957, to March 31, 1960 (in round numbers), from $436,000 to $3,379,000; that its cash account increased from $294,000 to $4,689,000; and that while it had an excess of current liabilities over current assets of $142,000 at the beginning of this period, it had an excess of current assets over current liabilities thereafter which increased to $6,038,000 at the end of the period. Also, that at the end of each fiscal year the ratio of current assets to current liabilities was in excess of 4 to 1. The petitioner contends that its accumulation of earnings was not for the purpose of avoiding income tax on its stockholders but was for the purposes (1) of protecting itself and its stockholders from losses arising from the risks of its business and (2) of increasing its net worth to be qualified for bidding on larger and larger contracts. The petitioner's business is heavy construction, including the building of highways, bridges, railroads, airports, pipelines, tunnels, dams and missile bases, and all forms of excavation and earth moving. Its contracts are principally obtained by competitive bidding on a lump sum or fixed unit *33 price basis. It does practically no subcontracting to others. The risks of a business of this nature are greater and require more capital than those of a business of general building contracting where some of the work is subcontracted to reduce the hazards. The petitioner assumes the risks of bad weather, strikes, unanticipated subsoil conditions, unexpected increases in costs of materials and equipment, and other hazards. The business is highly competitive, and contractors must assume these risks to get contracts. The petitioner was by no means invariably successful in its contracts. In fiscal 1954 it bid $710,000 on a contract and paid expenses of $1,416,000 to complete it. This loss left it with a deficit, and the stockholders had to guarantee personally its contracts in order to get further business. It had a loss on a road it built which was washed away by a hurricane. Its tax returns show losses on various individual contracts. In fiscal 1958 and 1959 it sustained losses on its domestic contracts as a whole and in fiscal 1961 it had a loss of $429,000 on all its ventures. The risks were very real and present. It is a reasonable business need to accumulate reserves to meet such *34 contingencies. L. R. Teeple Co., 47 B.T.A. 270 (1942), acq. 1942-2 C.B. 18. Petitioner's stockholders sought to build up its net worth so it could stand a loss if necessary. There are additional risks involved in undertaking foreign construction contracts, such as transportation hazards, political upheaval, native labor problems, currency exchange limitations, health risks, and communication difficulties. On certain of its contracts with the Defense Department the petitioner was subject to renegotiation. In two cases the Renegotiation Board determined that excessive profits of $1,500,000 and of $450,000 resulted, and proceedings for redetermination thereof are now pending in this Court. The joint venture in Pakistan agreed to refund $4 million under renegotiation. The petitioner also accumulated earnings to increase its net worth in order to qualify for bidding on larger contracts. The evidence shows that in the petitioner's business the net worth of a contractor is all important in getting new contracts. The bidder must furnish a bid bond or certified check in order to bid, and must then be prepared to furnish a performance bond if awarded the *35 contract. The petitioner cannot know which or how many bids will be accepted. Surety companies furnishing bonds for contractors usually require that the contractor have net quick assets equal to 10 percent of the work undertaken and net worth equal to 20 percent. In some places the contractor must show substantial net worth to be qualified to bid, and the amount of work it will be allowed to undertake will be limited according to its net worth. In California, for example, the requirements of one contracting agency limit a contractor to jobs not exceeding four times its net worth or ten times its net quick assets. The petitioner went into joint ventures with other contractors to bid on some contracts because it could not alone meet the financial requirements for bidding. On some contracts with states or public agencies there are retainages and delays in paying estimates which strain the financial resources of the contractor. The net worth of the contractor must meet these difficulties or support its power to borrow for such contingencies. The respondent concedes that a corporation has the right to grow, that public agencies demand financial qualifications for bidders on large contracts, *36 and that owners often prefer to deal with contractors of financial strength. We have said that any legitimate business may grow if legitimate means are employed. Crawford County Printing & Publishing Co., 17 T.C. 1404 (1952). Respondent contends that the retained earnings of $436,000 as of March 31, 1957, were sufficient for the reasonable needs of petitioner's business for the fiscal years 1958 through 1960. This amount, plus the capital stock of $250,000, provided the petitioner a net worth of $686,000. According to the qualifications required by surety companies and public agencies of a net worth equal to approximately 20 percent of the work program of a contractor, this would qualify petitioner in undertaking a work program of some $3,500,000. As of March 31, 1957, petitioner had a backlog of work under contract of over $15,500,000 and in fiscal 1958 was awarded $21,700,000 more in contracts. The contracts awarded in the following years were in increasing amounts. The petitioner's net worth was far from sufficient in these circumstances, and retention of its earnings in the taxable years was a reasonable need of its business to build up its net worth to the point *37 of carrying out its work program. Respondent points to the fact that petitioner was able to be awarded so large a program as evidence that the requirements of a large net worth in relation to its contracts are ignored. Respondent also argues that the risks of the petitioner's business are exaggerated, are unreal, and have been taken into consideration and covered in the bids submitted, and that the petitioner's success in overcoming such risks and making a substantial profit is evidence that the hazards of its business are not as serious as represented. The petitioner introduced testimony by five men of long experience in the heavy construction industry, one being an officer of one of the largest corporations in this business in the United States. Their testimony clearly demonstrated that the hazards of this business are real and ever present; that losses in substantial amounts frequently result from the hazards; that contractors are forced to assume these risks in order to get contracts; and that a conservative bidder has little chance to be awarded a contract on competitive bidding. They said further that the net worth and net current assets of the petitioner were not sufficient *38 in relation to the volume of work being undertaken by it in the taxable years. The evidence of the requirements of the California Department of Water Resources bears out the requirements described by petitioner. The evidence shows clearly that in the heavy construction industry as carried on by the petitioner, its joint venturers, and its competitors, a large net worth is a reasonable need of a corporation's business. There are advantages emanating from size and economic stability which are important in competing in this field. An increasing net worth enabled the petitioner to seek larger and larger contracts and to participate in additional joint ventures; to acquire needed construction equipment with cash; to put up cash or securities for its bonds instead of paying premiums for surety bonds; to reduce its bank loans and thereby reduce its payments of interest; to carry on its jobs while waiting for payment of amounts retained by public agencies where payment was delayed; and to protect itself and its stockholders from large losses or renegotiation refunds. These are all legitimate business purposes in the petitioner's field of operations. Respondent contends that the petitioner *39 should have distributed as dividends all its net earnings for the fiscal years 1958, 1959, and 1960, and points out that the Omans would have been subject to substantially larger income taxes, in excess of $1 million each with respect to the last year's earnings, had this been done. The fact that stockholders of a corporation would have been subject to substantial additional income taxes on distributed earnings is necessarily present in every case involving the tax on accumulated earnings. In discussing this tax we have said: But the taxes under these statutory provisions are not imposed because of effects; avoidance per se is not prohibited. It is the purpose, the intention motivating a course of conduct, which is made controlling by the very words of the statute. Unless the purpose was to prevent the imposition of surtaxes, the tax may not be imposed. Cecil B. DeMille, 31 B.T.A. 1161, 1174 (1935), affd. 90 F. 2d 12 (C.A. 9, 1937), certiorari denied 302 U.S. 713. We have also said that: No corporation which is actively engaged in business is to be subjected to the penalty of the statute unless and until it permits its course of conduct *40 to be diverted from its normal business interests by a purpose to save its stockholders from surtax. United Business Corporation of America, 19 B.T.A. 809, 828 (1930), affd. 62 F. 2d 754 (C.A. 2, 1933), certiorari denied 290 U.S. 635. It has been said that "to the extent the surplus has been translated into plant expansion, increased receivables, enlarged inventories, or other assets related to its business, the corporation may accumulate surplus with impunity." Smoot Sand & Gravel Corporation v. Commissioner, 274 F. 2d 495, 501 (C.A. 4, 1960), affirming a Memorandum Opinion of this Court. As of March 31, 1957, the petitioner had accumulated earnings of $436,000. It had a net worth of about $686,000 and a backlog of work of $15 1/2 million, or more than 20 times its net worth. During the fiscal year 1958 it was awarded contracts of more than $21 million. Its volume of work done exceeded $18 million. It sustained net losses on its domestic contracts but realized profits on its foreign joint ventures. It reported taxable income of $379,000 and tax of $191,000. At the end of the year it had retained earnings of $514,000. *41 This year resulted in an increase of retained earnings in the amount of some $78,000, and the backlog of work under contract was increased by more than $3 million. Such an increase in net worth was trifling, less than three percent, in comparison with the increased contract liability assumed by the petitioner. It was clearly a reasonable need of the petitioner's business to retain the entire earnings for fiscal 1958. In fiscal 1959 petitioner started with a backlog of work of more than $18,800,000, was awarded contracts of $27,500,000, and did a volume of $26 million of work. It sustained losses on its domestic contracts as a whole but realized profits on its foreign joint ventures. It reported taxable income of $225,000 and tax of $112,000. At the end of the year it had retained earnings of $582,000. This year resulted in an increase of retained earnings of some $67,000 and the backlog of work under contract was increased by $1,300,000. This increase in net worth was insignificant, less than six percent, in comparison with the increased contracts undertaken by the petitioner. As of March 31, 1959, it had a net worth of some $832,000 and a backlog of $20 million of work, or *42 more than 20 times its net worth. It is clear that the surplus as of that date was not an unreasonable accumulation for the needs of petitioner's business. In the two fiscal years ended in 1960 and 1961 the petitioner reported taxable income of some $2,332,000 and paid taxes of some $1,198,000. Among the contracts completed in those years was a joint venture in the Azores by Oman-Farnsworth-Wright. The income from this was $2,070,674.62, of which $1,926,921.57 was reported on the 1961 return, and $143,753.05 was not reported on either return. It is stipulated that this income should have been reported on the 1960 return and that petitioner had a net operating loss for fiscal 1961 in the amount of $429,007.53 for the purpose of a carryback to fiscal 1958 and 1959. Shortly before the end of the fiscal year 1960 John Oman, III, was killed in an airplane accident. The assets of the petitioner were increased by the net amount of the insurance carried on John's life which was in the face amount of $1,500,000. These two items - inclusion of the Azores joint venture income in fiscal 1960 and the addition of the life insurance proceeds - had the effect of abnormally increasing the apparent *43 amount of the retained earnings as of the end of that fiscal year. Respondent computes this amount at $3,378,936.94 as compared with $581,613.24 one year earlier. The essential question is whether the petitioner retained its earnings for fiscal 1960 to avoid income tax with respect to its shareholders. During the year petitioner was contracting for a work program of $50 million and carrying out $27 million of work and with a net worth of $832,000 at the start of the year. It invested $1,200,000 in additional construction equipment. It began to distribute dividends for the first time in December 1959 and March 1960. These were merely token amounts, but the stockholders had not previously diverted any funds from their objective of building up net worth to qualify the petitioner for larger contracts and to guard against losses. Just after the dividend was distributed in March and just before the end of the fiscal year, John was killed. This was hardly the occasion for the distribution of more and larger dividends. The effect on the petitioner's business of the loss of a principal officer could not be predicted. The proceeds of the life insurance, while increasing the amount of the assets, *44 were committed by previous agreement to the redemption of John's stock. Redemption of the stock of a minority stockholder is a valid business purpose, and funds retained for such a purpose are retained for the reasonable needs of a corporation's business. Dill Manufacturing Co., 39 B.T.A. 1023 (1939); Gazette Pub. Co. v. Self, 103 F. Supp. 779 (E.D. Ark., 1952). Although the petitioner had an increased amount of cash on hand at the end of the fiscal year, much of this was withdrawn from uncompleted joint ventures and was subject to future income taxes and renegotiation, or possibly to repayment if the venture turned out badly. The joint venture in the Azores, although substantially completed, was not expected to be finally completed until December 1960, and the ultimate profits were not known with certainty during the fiscal year ended March 31, 1960. The stipulation that such profits should have been reported in fiscal 1960 came later. Although the surplus per books was increased to $2,414,000, this amount should be reduced by the life insurance in appraising the *45 actual surplus available for needs of the business and possible dividends, leaving about $1 million in net worth. The backlog of work carried at the end of fiscal 1960 was $23,600,000 and a net worth of one to one and one-half million dollars, or even two million, would not be excessive in supporting such a program. Retention of those earnings for fiscal 1960 was for the reasonable needs of the business. Respondent points to certain specific uses of petitioner's funds in fiscal 1960 as unrelated investments or unwarranted loans to its principal stockholders. The petitioner paid certain bills of the Oman brothers and charged their individual accounts as a matter of convenience covering such items as life insurance premiums, taxes, utilities, and farm payrolls. These charges were offset by salary credits, and at the end of the year the Omans usually paid the balance owing. This accommodation was for convenience as they were traveling often and were sometimes out of the country. In fiscal 1960 they borrowed $365,000 to pay Federal tax deficiencies prior to seeking recovery in the District Court, and also borrowed $300,000 through their partnership from the petitioner to buy real estate *46 for construction of a shopping center. The total indebtedness amounted to about $850,000 in February 1960 but was entirely repaid before March 31. At the time of the loans the petitioner had a temporary surplus of cash on hand. The Omans were in a financial position to repay the loans at any time. We have held that large loans to stockholders for even longer periods than here are not evidence of improper accumulation of surplus. F. E. Watkins Motor Co., 31 T.C. 288 (1958), acq. 1959-1 C.B. 5. Also, the use of funds to acquire land for a shopping center led to the subsequent contract for the petitioner to build the center at a profit. In May 1959 petitioner loaned $1 million to Thompson & Green Machinery Company. This was an investment of surplus cash to a solvent concern and the notes could have been sold to a bank had petitioner required the cash. The loan was repaid in the following fiscal year. The notes were carried as current assets on petitioner's books. Where net worth is a tool in the corporation's business, as in petitioner's business, assets readily convertible into cash are not unrelated investments. In February 1960 the Omans used petitioner's *47 funds to buy two lots in a residential area in Florida, and title was taken in their individual names, as this was required by the sellers. This was a joint venture with another company to build a few houses for resale. In March 1960 petitioner purchased land in Davidson County, Tennessee, intending to build a warehouse, but an industrial concern which owned adjacent property made an offer for the tract and petitioner sold the land at a profit after the fiscal year 1960. In August 1959 petitioner purchased a tract referred to as the Lightman property consisting of about 200 acres located in Nashville, on the Cumberland River. This was river bottom land. It served as a source of dirt or topsoil for use in petitioner's local contracts in Nashville and as a place for dumping waste materials. Its location made it of potential future value for an industrial subdivision after the level was raised, which could be done in time by dumping. At the time petitioner negotiated with the executors of John's will for redeeming the petitioner's stock held by the estate it was also agreed that this tract would be transferred to Vine Street, a corporation in which the estate retained an interest, at *48 cost, together with another tract located on Murfreesboro Road. The tracts had potential future value and the executors considered it desirable for John's family to retain, through Vine Street, an interest in these properties. At the time it was agreed that petitioner might continue to use the dirt and to dump waste materials. This transfer was agreed upon and effected in June 1960, after the close of fiscal 1960. These investments were not unrelated to petitioner's business. Respondent contends that petitioner had no specific, definite, and feasible plan for the use of its accumulated earnings, and no specific amounts were retained for identified purposes. In petitioner's business it bids on many offered jobs and does not know in advance which bids will be accepted. Once accepted, petitioner is committed to complete the job and may at any time be required to purchase another $500,000 worth of equipment. It maintained a large inventory of construction equipment, in excess of its net worth, and its net purchases exceeded $500,000 in fiscal 1959, $1,200,000 in fiscal 1960, and $770,000 in fiscal 1961. Its capital requirements were therefore very large. Its potential requirements for *49 renegotiation refunds cannot be predicted. Its funds are needed for equipment, for qualification to bid, for losses, for renegotiation refunds, and for maintaining an organization of engineers and superintendents. The impossibility of being specific as to the amounts retained for each named purpose cannot reasonably be a ground for condemning the accumulation for such purposes collectively. Respondent refers to events subsequent to the taxable years and as late as fiscal 1964 to show that the petitioner's accumulated surplus in the taxable years was unreasonable. The question is to be determined by the facts as of the close of the years involved, and subsequent events may be considered only to determine whether the corporation actually intended to consummate the plans for which the earnings were accumulated.[4] Subsequent events which are pertinent show that petitioner was awarded nearly $32 million in contracts in fiscal 1961 and $28 million in fiscal 1962 and completed increasing volumes of work; that it acquired larger amounts of construction equipment after 1962; and that it took a share of the Oroville Dam contract in 1962 of 11 percent and later assumed a larger part of that *50 job. These are consistent with the argument that the intent of the stockholders was to build up the net worth by accumulating earnings to the point petitioner could bid upon larger and larger contracts. There is no indication that a tax avoidance purpose existed or that petitioner's conduct was diverted from its normal business interests by a purpose of saving its stockholders from additional income taxes. See United Business Corporation of America, supra.Its earnings were applied to equipment related to its business or to assets to support its qualifications for bidding or to reduce the need for borrowing. These were needs of its business, or reasonably anticipated needs. There is nothing reprehensible in building up net worth by ploughing back earnings so that a corporation may compete more effectively in its field. We hold that petitioner was not availed of during the taxable years for the purpose of avoiding income tax with respect to its stockholders by permitting earnings and profits to accumulate instead of being divided and distributed. *51 Decision will be entered under Rule 50. Footnotes
1. SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of - (1) 27 1/2 percent of the accumulated taxable income not in excess of $100,000, plus (2) 38 1/2 percent of the accumulated taxable income in excess of $100,000. SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule. - The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed. * * *↩
2. SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. (a) Unreasonable Accumulation Determinative of Purpose. - For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary. * * *↩
3. SEC. 534. BURDEN OF PROOF. (a) General Rule. - In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall - (1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or (2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection. * * *
(c) Statement by Taxpayer. - Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business.↩
4. S. Rep. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., pp. 69-70 (1954): Your committee agrees with the House that only the facts as of the close of the taxable year should be taken into account in determining whether an accumulation is reasonable. If the retention of earnings is justified as of the close of the taxable year, subsequent events should not be used for the purpose of showing that the retention was unreasonable in such year. However, subsequent events may be considered to determine whether the corporation actually intended to consummate the plans for which the earnings were accumulated.↩